## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

AKARI JOHNSON,
and HAZEL THOMPSON,

           Plaintiffs,                            CASE NO.:

      v.                                  Jury Trial Demanded

MMI 82, LLC,
and THE ENTHUSIAST LLC,

           Defendants.

_____/

## COMPLAINT

Plaintiffs, AKARI JOHNSON and HAZEL THOMPSON (hereinafter referred to as the "Plaintiffs" collectively), by and through their undersigned counsel, hereby complain of the Defendants, MMI 82, LLC (hereinafter referred to as "Defendant MMI") and THE ENTHUSIAST LLC (hereinafter referred to as "Defendant ENTHUSIAST") (collectively, "Defendants"), and in support allege as follows:

## INTRODUCTION

1.     This case involves two Black front desk agents who were subjected to unlawful discrimination and retaliation during their employment and were unlawfully deprived of the wages owed to them by their employers.

2.     Plaintiffs seek monetary relief to redress Defendants' unlawful employment practices in violation of 42 U.S.C. § 1981 *et seq*. ("Section 1981") and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA").

## PARTIES

3.     Plaintiff, AKARI JOHNSON ("Mr. Johnson" and/or "Plaintiff Johnson"), is an

individual Black man, a resident of Miami-Dade County, Florida, over the age of eighteen years, and otherwise *sui juris*.

4.    Plaintiff, HAZEL THOMPSON ("Ms. Thompson" and/or "Plaintiff Thompson"), is an individual Black woman, a resident of Miami-Dade County, Florida, over the age of eighteen years, and otherwise *sui juris*.

5.    Defendant MMI  is a Florida limited liability company, authorized to do and doing business in the State of Florida, that owns, manages, exercises control over, possesses and/or operates the hotel called Casa Morada ("Casa Morada"), which is located at 136 Madeira Road, Islamorada, FL 33036.

6.    Defendant ENTHUSIAST is a Nevada limited liability company, that owns, manages, exercises control over, possesses and/or operates a series of hotels across the United States, including Casa Morada. ENTHUSIAST maintains a website that promotes Casa Morada as a hotel in its collection of properties.

7.    Upon information and belief, Defendant MMI and Defendant ENTHUSIAST were Plaintiffs' joint and/or sole employer during their respective periods of employment.

8.    Plaintiffs were hourly employees of Defendants, as the term "employee" is defined by 29 U.S.C. § 203(e).

9.    Plaintiffs were non-exempt employees of Defendants.

10.    Defendants are an "employer" within the meaning of 29 U.S.C. § 203(d).

11.    At all times material hereto, Defendants determined and controlled Plaintiff's work schedule and job duties.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. This action is

authorized and instituted pursuant to 42 U.S.C. § 1981 and 29 U.S.C. § 201.

13.     Venue is proper in this Court under 28 U.S.C. §1391 because the events giving rise to this action occurred within the jurisdiction of the United States District Court for the Southern District of Florida.

## FACTUAL ALLEGATIONS

14.     In or around early May 2023, Defendants hired Plaintiff Thompson as a Front Desk Agent.

15.     In or around early June 2023, Defendants hired Plaintiff Johnson as a Front Desk Agent.

16.     At all times material, Plaintiffs were considered satisfactory employees and had a record of positive performance.

17.     As Front Desk Agents, Plaintiffs were responsible for welcoming and checking-in the guests of Casa Morada (the "patrons" hereafter).

18.     From the very beginning of their respective tenures, Defendants subjected Plaintiffs to discrimination and harassment on the basis of their race and color.

19.     By means of example, Defendants unlawfully refused Plaintiff Thompson any overtime wages, refused Plaintiff Johnson adequate overtime wages, assigned unfavorable tasks to Plaintiffs, denied Plaintiffs the same employment privileges afforded to their non-Black co-workers, threatened to call the police, the Immigration and Customs Enforcement, and educational institutions against Plaintiffs because they opposed discriminatory and unlawful conduct, and terminated/constructively discharged Plaintiffs, among others.

20.     At all times material, Oneil Khosa ("Mr. Khosa") was an individual white male, who served as CEO and Founder for Defendants. Mr. Khosa asserted supervisory authority over Plaintiffs, including the power to hire, fire, demote, and/or promote Plaintiffs.

21.     At all times material, Mr. Khosa asserted supervisory authority over all MMI and ENTHUSIAST employees.

22.     At all times material, Mr. Khosa's primary duty was the management of Defendants' business and the management of Defendants' employees.

### Defendants Unlawfully Denied Plaintiffs Overtime in Violation of the FLSA

23.     At all times material, Defendants maintained control, oversight, and direction over the Plaintiffs, including the ability to hire, fire, and discipline them.

24.     At all times material, Defendants regularly employed two or more employees for the relevant time that handled goods or materials that travelled through interstate commerce, or used instrumentalities of interstate commerce, thus making Defendants' business an enterprise covered under the Fair Labor Standards Act.

25.     At all times material, Defendants were an enterprise engaged in interstate commerce in the course of their marketing, locations, services, and sale of foodstuffs, produce, meats, fish, beverages, coffees, teas, alcoholic beverages, and products that have moved through interstate commerce.

26.     At all times material, Defendants regularly and recurrently obtained, solicited, exchanged, and sent funds to and from outside of the State of Florida, used telephonic transmissions going outside of the State of Florida to conduct business, and transmitted electronic information through computers, the internet, via email, and otherwise outside of the State of Florida.

27.     At all times material, Defendants have had gross revenues in excess of $500,000.00 per year.

28.     At all times material, Defendant ENTHUSIAST maintains a collection of properties located in various states including Maine, North Carolina, California and Florida. Defendant ENTHUSIAST additionally maintains a property location in the Bahamas. Defendant ENTHUSIAST promotes each property on its website, and specifically includes Casa Morada as a property in its collection.

29.     At all times material, Defendants were an "enterprise engaged in commerce or the production of goods for commerce," within the meaning of 29 § U.S.C. 206(a).

30.     At all times material, the Defendants had two or more "employees handling, selling or otherwise working on goods or material that have been moved in or produced for commerce by any person," within the meaning of 29 § U.S.C. 203(s)(1)(A).

31.     At all times material, Defendants had an annual gross volume of sale made or business done of not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated), within the meaning of 29 § U.S.C. 203(s)(1)(A).

32.     As part of the Plaintiffs' employment, Defendants agreed to pay Plaintiff Thompson $20 per hour and Plaintiff Johnson $18 per hour.

33.     From the onset of Plaintiffs' employment, Defendants failed to adequately pay overtime wages to Plaintiffs.

34.     Plaintiffs requested overtime pay of 1.5 times the standard rate for any hours worked over 40, but Defendants denied their request.

35.     Plaintiff Thompson worked an average of 65 hours each week from May 2023 until July 2023, and an average of 55 hours each week from August 2023 until her termination in December 2023.

36.     Defendants merely paid Plaintiff Thompson each week for 40 hours of her work, failing to pay any overtime wages in violation of the FLSA.

37.     Defendants refused to pay overtime wages and instead offered Plaintiff Thompson vacation days and paid time off, insisting that Defendants do not pay overtime to its employees. However, Defendants then proceeded to deny Plaintiff Thompson the ability to use vacation days and paid time off upon her requests. This was all a part of Defendants' scheme to avoid paying Plaintiff Thompson any overtime wages.

38.     In fact, on or around December 17, 2023, Plaintiff Thompson messaged Ms. Ailleen Gonzalez (hereinafter "Ms. Gonzalez"), General Manager for Defendants, inquiring about owed overtime pay. Ms. Gonzalez asserted supervisory authority over Plaintiffs, including the power to hire, fire, demote, and/or promote Plaintiffs. Plaintiff Thompson requested her owed overtime pay be conferred, and Ms. Gonzalez responded, "I'm going to go through and see about your overtime."

39.     On or around December 23, 2023, Plaintiff Thompson again requested Defendants pay her any owed overtime wages. Plaintiff Thompson sent this request in writing to Ms. Gonzalez.

40.     As a response to Plaintiff Thompson's request, Ms. Gonzalez responded, "Oneil says we will pay you salary[,] ... He wants to know how you were calculating the [overtime] plus vac[ation] if the [overtime] would technically be the vac[ation] or [paid time off]."

41.     Ms. Gonzalez used the word "salary," but Plaintiff was an hourly employee for the duration of her employment. Ms. Gonzalez even signed an agreement declaring Plaintiff be paid

$800 per week, to work 40 hours per week. This is a clear indication that Plaintiff was an hourly employee. Ms. Gonzalez additionally admitted to Defendants' employment practice of denying overtime and equating overtime pay to vacation pay or paid time off ("PTO").

42.     Defendants also employed Plaintiff Johnson to work an excess of 40 hours per week and failed to pay him adequate overtime wages for the duration of his employment.

43.     In fact, Defendants paid Plaintiffs by check, and Defendants' checks frequently failed to clear. Plaintiffs had brought the fact that their paychecks were bouncing to Defendants' attention, yet each time Defendants merely responded to wait a few days and try again.

44.     At all times material hereto, Plaintiffs lived paycheck-to-paycheck, meaning they did not have a few days to spare before running out of money that they needed to survive. Despite Plaintiffs' clear and urgent requests, Defendants continued issuing bad checks.

45.     On or around December 25, 2023, Mr. Khosa directly messaged Plaintiff Johnson and reiterated that PTO and overtime were not applicable to Plaintiffs.

46.     At all times material, Defendants willfully and intentionally refused to pay Plaintiffs overtime wages earned for work performed.

47.     Defendants failed to properly track Plaintiffs' hours or paid overtime wages, and cannot show that Plaintiffs were adequately compensated.

48.     At all times material, Defendants failed to investigate whether their failure to pay Plaintiffs overtime pay violated the FLSA.

49.     Plaintiffs are entitled to payment of all overtime that Defendants were required to pay to Plaintiffs.

**Defendants Unlawfully Discriminated Against Plaintiffs on the Basis of their Race and Color**

50.　At all times material, Ellen Summers ("Ms. Summers"), an individual white female who was employed by Defendants as the Director of Client Services, asserted supervisory authority over Plaintiffs, including the power to hire, fire, demote, and/or promote Plaintiffs.

51.　Ms. Summers was in charge of overseeing daily operations, setting performance goals, performance management, and filling in additional roles when needed.

52.　Ms. Summers delegated tasks to Plaintiffs and interacted with Plaintiffs on a daily basis.

53.　From the onset of Plaintiffs' employment, Ms. Summers treated them worse than non-Black employees. Ms. Summers believed Plaintiffs were beneath her, so she typically ignored Plaintiffs altogether.

54.　Ms. Summers set the tone for her discriminatory conduct towards Plaintiff Johnson by ignoring his very first attempt to introduce himself.

55.　Plaintiff Johnson was hired to be a Front Desk Agent, but was assigned the following tasks: Moving furniture, cleaning and unclogging toilets, serving alcohol behind the bar, bringing items to Mr. Khosa and his friends, running the social media, and performing handiwork. None of these tasks were delegated to non-Black Front Desk Agents.

56.　Plaintiff Thompson was hired to be a Front Desk Agent, but was additionally asked to work behind the bar, move furniture, decorate hotel rooms and perform additional work from home on a company laptop.

57.　Defendants sent Plaintiffs home with a laptop computer to perform additional work.

58.　Plaintiffs attempted to tell Mr. Khosa that they were not comfortable completing tasks outside of the Front Desk Agent position. Instead of figuring out a viable solution, Mr. Khosa

merely compelled Plaintiffs to perform the tasks by threatening to call Immigration and Customs Enforcement on Plaintiffs while bringing attention to their immigration status.

59.     Mr. Khosa repeatedly responded to Plaintiff's complaints with threats of deportation rather than meaningfully addressing their concerns.

60.     When Ms. Summers was not ignoring Plaintiffs, she treated them inferior to her. Ms. Summers would make comments to Plaintiffs about the housekeeping staff, saying "this is America, they need to learn English," and "they need to go back to where they came from."

61.     Plaintiffs were disgusted with Ms. Summers' commentary, especially because they are not from the United States and have an accent. Plaintiffs told Ms. Summers they would prefer if she did not speak like that, but Ms. Summers continued directing her discriminatory remarks to Plaintiffs.

62.     Ms. Summers and Mr. Khosa collectively spoke down on Defendants' non-white employees in front of Plaintiffs. By means of example, Ms. Summers once walked up to Plaintiff Thompson at the front desk and began speaking about one of the non-white employees, stating, "She's a fuck up and a piece of shit."

63.     In or around September 2023, both Plaintiffs worked at the front desk, and one morning Ms. Summers burst through the front doors and slammed the doors behind her. Ms. Summers marched towards Plaintiffs behind the front desk and began shouting at Plaintiffs because they allowed guests to take photos on a boat located on the property. Plaintiffs tried to explain that Mr. Khosa granted permission for guests to take pictures on the boat, but Ms. Summers refused to listen and continued to verbally berate Plaintiffs in front of guests and coworkers.

64.     In fact, this exchange escalated significantly when Bill Todd, Ms. Summers' husband and handyman for Defendants who roamed the property, stormed up to the front desk and

charged the Plaintiffs with his fist raised as if he were going to physically strike them. Plaintiffs were terrified for their physical wellbeing and cried out for help upon belief that Mr. Summers, a larger man, was going to harm them. Ms. Summers physically restrained her husband from beating Plaintiffs, giving Plaintiffs time to run away from their attacker.

65.   Plaintiffs immediately called Mr. Khosa to report this conduct, to which he responded, don't worry about it, it's fine, that's just how Bill is. Mr. Khosa never took any further measures to guarantee Plaintiffs' safety. As a result, Plaintiffs feared for their safety each and every day moving forward while working for Defendant.

66.   In fact, Plaintiffs learned from Marah Karas, a former front desk agent employed by Defendants, that Bill had a tendency for violence and had attacked Marah prior to Plaintiff's employment. Mr. Khosa knew of Bill's behavior and did not take any precaution with respect to protecting his employees from Bill.

67.   Plaintiff Thompson communicated with Ms. Gonzalez about the hostile working environment, and Ms. Gonzalez wrote, "[Honestly] I just want to quit. I'm depressed and miserable… I [am] beginning to dislike this damn job… I spent over an hour in my car crying before I got here."

68.   On or around September 27, 2023, Ms. Gonzalez texted Plaintiff Thompson, "Oneil thrives in chaos… Oneil's properties will never be successful because he is the problem."

69.   In or around December 2023, Plaintiff Johnson was asked to work a shift while Casa Morada was hosting a wedding party. Upon completing his shift, Ms. Gonzalez told Plaintiff he was allowed to leave. Plaintiff Johnson walked all the way to the bus stop as he was ready to go home, however, Ms. Summers did not believe that Plaintiff Johnson completed his tasks.

70.     Ms. Summers called Plaintiff Johnson on the phone demanding he return to work. Plaintiff Johnson explained that Ms. Gonzalez gave him the "okay" to leave because she would complete the task that Ms. Summers was asking of him. Ms. Summers took offense to this response and began a verbal onslaught of racially disparaging remarks to Plaintiff Johnson. Ms. Summers screamed at Plaintiff Johnson over the phone, and her verbal assault culminated as she yelled, "**Akari, get your black ass back to work right now!**"

71.     Plaintiff Johnson was shocked with what his director just said to him. Plaintiff Johnson immediately hung up the phone before Ms. Summers could make further racially-charged comments. Plaintiff Johnson called his mother, Plaintiff Thompson, and told her about Ms. Summers' racial and unlawful conduct.

72.     Plaintiff Johnson was devastated by Ms. Summers' behavior, so he texted her stating, "I am not your child... If I was [a] 30 year old white male I would have not been spoke[n] to like that, and I will not take that... You are disrespectful and your behavior is that of an ageist racist."

73.     Instead of apologizing or taking corrective action, Ms. Summers responded, "you [and your mother] are so off base... go [] on your way... you are way out of line." Ms. Summers doubled down on her racist behavior and in fact instructed Plaintiffs to resign from their employment because she would not change how she treated them.

74.     Plaintiffs reported this unlawful conduct to Mr. Khosa, who brushed these reports off entirely and ultimately supported Ms. Summers' conduct by encouraging Plaintiffs to resign.

75.     As such, in response to Plaintiffs' opposition to Ms. Summers' racist and unlawful behavior, Ms. Summers and Mr. Khosa directed Plaintiffs to resign, thereby discharging them.

76.     Ms. Summers remains employed by Defendants. Not only did Ms. Summers' husband physically threaten Plaintiffs, but Ms. Summers made racially disparaging remarks to Plaintiffs about the color of their skin and treated Plaintiffs worse than non-Black employees because of the color of their skin.

77.     Defendants failed to take any meaningful corrective action in response to Plaintiffs' complaints and opposition to unlawful, discriminatory conduct. Plaintiffs were left with no choice but to resign from their positions with Defendants.

78.     In or around late December 2023, Defendants constructively terminated Plaintiffs.

**<u>Defendants Unlawfully Retaliated Against Plaintiffs</u>**

79.     Defendant's retaliatory conduct consisted of denying Plaintiffs' requests for overtime pay while increasing Plaintiffs' hours, assigning Plaintiffs unfavorable job assignments such as cleaning toilets and moving furniture, directing racist comments towards Plaintiff Johnson, and terminating Plaintiffs following their complaints of and opposition to unlawful discriminatory conduct. Defendants' retaliatory actions were direct responses to Plaintiffs' complaints and opposition.

80.     Following Defendants' termination of Plaintiffs, on or around December 25, 2023, Mr. Khosa texted Plaintiff Johnson the following: "Here is what I am going to do - - have the lawyers go [to] the immigration department and to your potential school and advise them of what you have done, inform the Monroe county chamber of commerce of what you have done and go to the Islamorada police chief with a claim for theft of company property… Unless you give us back our social media access, and return the laptop by noon tomorrow."

81.     To be clear, Defendants provided Plaintiffs with this laptop to perform additional work from home. Following Defendants' termination of Plaintiffs, Plaintiffs again asked to be

compensated for any owed overtime wages, and even agreed to drive two (2) hours to return the laptop once they were paid their overtime and owed compensation.

82.     Mr. Khosa, as a response to Plaintiffs opposing Defendants' unlawful discriminatory conduct and withholding of overtime wages, threated to 1) take legal action and report Plaintiffs to Immigration and Customs Enforcement, 2) report Plaintiff Johnson, who was is in the college admissions process and seeking to obtain higher education, to educational institutions, 3) report Plaintiffs to the chamber of commerce, and 4) file a claim against Plaintiffs with the Islamorada Police.

83.     Plaintiff Johnson expressed his fear and explained Plaintiffs' intention to return the computer following the payment of overtime wages. Plaintiff Johnson continued that he was not in possession of the social media account, in fact, he merely managed the social media from the computer but did not have the login information.

84.     Plaintiff Johnson replied to Mr. Khosa saying, "[Mr. Khosa's text] really scares me… I am a 19 year old college student… What does immigration have to do with social media? Or what does my school have to do with social media?... The company computer was provided to [Plaintiff Thompson], my mother[,] by Aileen the General Manager… Why are you using the force of fear?... I sit in fear sending this letter… the emotional distress has been severe…"

85.     Mr. Khosa responded, "I don't want to waste any more time on this."

86.     Mr. Khosa threatened to take significant action against Plaintiffs, but when they tried resolving these matters he was not interested in finding a solution.

87.     Defendants made Plaintiffs' working conditions so onerous, abusive, and intolerable that no employee in their shoes would have reasonably been expected to continue working for Defendants, such that Plaintiffs' resignation was devoid of choice or free will.

88.     The above-described conduct represents just some examples of the unlawful discrimination, harassment, and retaliation to which Defendants subjected Plaintiffs.

89.     Defendants unlawfully discriminated against Plaintiffs on the basis of their race and color.

90.     Defendants are either directly or vicariously responsible for the unlawful acts and conduct complained of herein.

91.     As a result of Defendants' actions, Plaintiffs felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

92.     At all times material, Defendants' employees acted as agents of Defendants in their discriminatory and unlawful treatment of Plaintiffs.

93.     At all times material, Defendants acted with deliberate indifference to the discriminatory treatment and hostile work environment complained of herein.

94.     As a result of the acts and conduct complained herein, Plaintiffs have suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiffs have also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiffs have further experienced severe emotional and physical distress.

95.     Defendants' conduct was malicious, willful, extreme, and outrageous, and conducted with full knowledge of the law so as to justify an award of punitive damages against Defendant.

## CAUSES OF ACTION
### COUNT I
### 42 U.S.C. § 1981
### RACE AND COLOR DISCRIMINATION
### (Plaintiff Johnson against all Defendants)

96.　　Mr. Johnson reincorporates the factual allegations in Paragraphs 14 through 95.

97.　　Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

98.　　Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

99.　　Mr. Johnson is a black individual, and he is therefore a protected class member.

100.　　The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

101.　　Defendants subjected Mr. Johnson to discriminatory treatment on the basis of his race and skin color.

102.　　Defendants' discriminatory treatment included, but was not limited to, denying Mr. Johnson the same employment privileges afforded to his non-Black co-workers; assigning Mr. Johnson unfavorable tasks that non-black coworkers were not required to complete, such as lifting and moving furniture, bartending, cleaning and unclogging toilets, and running Casa Morada's social media; and unlawfully terminating Mr. Johnson.

103.    Defendants targeted Mr. Johnson because he is black. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Johnson was forced to endure.

104.    The discriminatory actions of Defendants against Mr. Johnson, as described and set forth above, constitute an adverse employment action for purposes of Section 1981. In subjecting Mr. Johnson to adverse employment actions, Defendants intentionally discriminated against Mr. Johnson with respect to the compensation, terms, conditions, or privileges of his employment.

105.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of Section 1981, Mr. Johnson has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Johnson has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

106.    Mr. Johnson accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

107.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Johnson's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

108.    Defendants' conduct deprived Mr. Johnson of his statutory rights guaranteed under Section 1981.

109.    Mr. Johnson further requests that his attorney's fees and costs be awarded as permitted by law.

<u>**COUNT II**</u>
**42 U.S.C. § 1981**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff Johnson against all Defendants)**

110.    Mr. Johnson reincorporates the factual allegations in Paragraphs 14 through 95.

111.    Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

112.    Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

113.    Mr. Johnson is a black individual, and he is therefore a protected class member.

114.    The Defendants' discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

115.    Defendants' severe and pervasive conduct included, but was not limited to, subjecting Mr. Johnson to racist language including telling Mr. Johnson to get his black ass back to work; denying Mr. Johnson the same employment privileges afforded to his non-Black co-workers; assigning Mr. Johnson unfavorable tasks that non-black coworkers were not required to complete, such as lifting and moving furniture, bartending, cleaning and unclogging toilets, and running Casa Morada's social media; and unlawfully terminating Mr. Johnson.

17

116.    Defendants targeted Mr. Johnson because he is black. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Johnson was forced to endure.

117.    Defendants' discriminatory conduct toward Mr. Johnson negatively impacted both his professional life and his personal life. Defendants' conduct made Mr. Johnson feel isolated, humiliated, embarrassed, and ashamed.

118.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of Section 1981, Mr. Johnson has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

119.    Mr. Johnson has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

120.    Mr. Johnson accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

121.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Johnson's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

122.    Defendants' conduct deprived Mr. Johnson of his statutory rights guaranteed under Section 1981.

123.    Mr. Johnson further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT III**
**42 U.S.C. § 1981**
**RETALIATION**
**(Plaintiff Johnson against all Defendants)**

124.    Mr. Johnson reincorporates the factual allegations in Paragraphs 14 through 95.

125.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

126.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

127.     The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

128.     Defendants retaliated against Mr. Johnson for reporting discrimination on the basis of his race and skin color in violation of Section 1981.

129.     Mr. Johnson engaged in protected activity by making several complaints to Defendants and opposing Defendants' unlawful actions of failure to adequately pay overtime wages.

130.     Mr. Johnson was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

131.     Defendants' actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in similar protected activity.

132.     Mr. Johnson engaged in protected activity by reporting Mr. Summers' unlawful discriminatory behavior to his supervisors, Ms. Summers and Mr. Khosa. Ms. Summers and Mr.

Khosa disregarded Mr. Johnson's claims and took no remedial measures and continued assigning Mr. Johnson additional unfavorable assignments.

133.    Mr. Johnson further engaged in protected activity by opposing Ms. Summers' racist and unlawful activity, who then encouraged Mr. Johnson to terminate his employment.

134.    Shortly thereafter, Mr. Johnson engaged in protected activity by reporting Ms. Summers' racist and unlawful activity to Mr. Khosa, who additionally encouraged Mr. Johnson to terminate his employment as a result of Mr. Johnson engaging in a protected activity.

135.    There is a causal connection between Mr. Johnson's reports of unlawful discrimination and failure to pay overtime wages and Defendants terminating Mr. Johnson's employment.

136.    In response to Mr. Johnson opposing the discriminatory and unlawful conduct and asserting his right to enjoy the same employment benefits as every other employee, Defendants retaliated against Mr. Johnson.

137.    Defendants retaliated against Mr. Johnson by engaging in conduct, including but not limited to, assigning Mr. Johnson less favorable tasks such as cleaning toilets and working as a handyman despite his front desk agent title; refusing to adequately pay Mr. Johnson overtime; and unlawfully terminating Mr. Johnson. Following Defendants' termination of Mr. Johnson, Mr. Johnson again opposed Defendants' withholding of owed overtime wages, and as a result, Defendants threatened to take action against Mr. Johnson by reporting him to the Immigration and Customs Enforcement, the Islamorada Police Department, the Chamber of Commerce, and any future educational institution that Mr. Johnson would attend.

138.    Defendants took the above-mentioned materially adverse actions, among others, against Mr. Johnson because of his protected activities.

139.     Any reasonable employee in Mr. Johnson's position would be dissuaded from reporting racism or opposing unlawful conduct if they knew that they would be subjected to the kind of treatment that Mr. Johnson was forced to endure.

140.     Defendants' alleged bases for its adverse employment actions against Mr. Johnson are pretextual and have been asserted only to cover up the retaliatory nature of Defendants' conduct.

141.     As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of Section 1981, Mr. Johnson has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Johnson has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

142.     Mr. Johnson accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

143.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Johnson's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

144.     Defendants' conduct deprived Mr. Johnson of his statutory rights guaranteed under Section 1981.

145.     Mr. Johnson further requests that his attorney's fees and costs be awarded as permitted by law.


[THIS SPACE INTENTIONALLY LEFT BLANK]

## COUNT IV
### 42 U.S.C. § 1981
### RACE AND COLOR DISCRIMINATION
#### (Plaintiff Thompson against all Defendants)

146.    Ms. Thompson reincorporates the factual allegations in Paragraphs 14 through 95.

147.    Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

148.    Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

149.    Ms. Thompson is a black individual, and she is therefore a protected class member.

150.    The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

151.    Defendants subjected Ms. Thompson to discriminatory treatment on the basis of her race and skin color.

152.    Defendants' discriminatory treatment included, but was not limited to, denying Ms. Thompson the same employment privileges afforded to her non-Black co-workers; assigning Ms. Thompson unfavorable tasks that non-black coworkers were not required to complete, such as lifting and moving furniture, bartending, designing guest rooms, and even provided Ms. Thompson with a laptop computer so she could work additional hours from home; and unlawfully terminating Ms. Thompson.

153.    Defendants targeted Ms. Thompson because she is black. No similarly situated employee outside his protected class endured the discriminatory conduct that Ms. Thompson was forced to endure.

154.    The discriminatory actions of Defendants against Ms. Thompson, as described and set forth above, constitute an adverse employment action for purposes of Section 1981. In subjecting Ms. Thompson to adverse employment actions, Defendants intentionally discriminated against Ms. Thompson with respect to the compensation, terms, conditions, or privileges of her employment.

155.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of Section 1981, Ms. Thompson has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Thompson has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

156.    Ms. Thompson accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

157.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Thompson' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

158.    Defendants' conduct deprived Ms. Thompson of her statutory rights guaranteed under Section 1981.

159.    Ms. Thompson further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT V
### 42 U.S.C. § 1981
### HOSTILE WORK ENVIRONMENT
### (Plaintiff Thompson against all Defendants)

160.     Ms. Thompson reincorporates the factual allegations in Paragraphs 14 through 95.

161.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

162.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

163.     Ms. Thompson is a black individual, and she is therefore a protected class member.

164.     Defendants' discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

165.     Defendants' severe and pervasive conduct included, but was not limited to, subjecting her son, Mr. Johnson, to racist language including telling Mr. Johnson to get his black ass back to work; denying Ms. Thompson the same employment privileges afforded to her non-Black co-workers; assigning Ms. Thompson unfavorable tasks that non-black coworkers were not required to complete, such as lifting and moving furniture, bartending, designing guest rooms, and even provided Ms. Thompson with a laptop computer so she could work additional hours from home; and unlawfully terminating Ms. Thompson.

166.    Defendants targeted Ms. Thompson because she is black. No similarly situated employee outside her protected classes endured the discriminatory conduct that Ms. Thompson was forced to endure.

167.    Defendants' discriminatory conduct toward Ms. Thompson negatively impacted both her professional life and her personal life. Defendants' conduct made Ms. Thompson feel isolated, humiliated, embarrassed, and ashamed.

168.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Ms. Thompson has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

169.    Ms. Thompson has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

170.    Ms. Thompson accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

171.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Thompson' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

172.    Defendants' conduct deprived Ms. Thompson of her statutory rights guaranteed under Section 1981.

173.    Ms. Thompson further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VI**
**42 U.S.C. § 1981**
**RETALIATION**
**(Plaintiff Thompson against all Defendants)**

174.    Ms. Thompson reincorporates the factual allegations in Paragraphs 14 through 95.

175.    Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

176.    Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

177.    The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

178.    Defendants retaliated against Ms. Thompson for reporting discrimination on the basis of her race and skin color in violation of Section 1981.

179.    Ms. Thompson engaged in protected activity by making several complaints to Defendants and opposing Defendants' unlawful actions and failure to pay owed overtime wages.

180.    Ms. Thompson was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

181.    Defendants' actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in similar protected activity.

182.    Ms. Thompson engaged in protected activity by reporting Mr. Summers' unlawful discriminatory behavior to Mr. Khosa. Mr. Khosa disregarded Ms. Thompson's claims and took no remedial measures and continued assigning Ms. Thompson additional unfavorable assignments.

183.     Ms. Thompson further engaged in protected activity by opposing Ms. Summers' racist and unlawful activity, who then encouraged Ms. Thompson to terminate her employment.

184.     Shortly thereafter, Ms. Thompson engaged in protected activity by reporting Ms. Summers' racist and unlawful activity to Mr. Khosa, who additionally encouraged Ms. Thompson to terminate her employment.

185.     There is a causal connection between Ms. Thompson's reports of unlawful discrimination and Defendants terminating Ms. Thompson's employment.

186.     In response to Ms. Thompson opposing the discriminatory conduct and asserting her right to enjoy the same employment benefits as every other employee, Defendants retaliated against Ms. Thompson.

187.     Defendants retaliated against Ms. Thompson by engaging in conduct, including but not limited to, lifting and moving furniture, bartending, designing guest rooms, and even provided Ms. Thompson with a laptop computer so she could work additional hours from home; refusing to pay Ms. Thompson overtime; and unlawfully terminating Ms. Thompson. Following Defendants' termination of Ms. Thompson, Ms. Thompson again opposed Defendants' withholding of owed overtime wages, and as a result, Defendants threatened to take action against Ms. Thompson by reporting her to the Immigration and Customs Enforcement, the Islamorada Police Department, the Chamber of Commerce, and any future educational institution that her son would attend.

188.     Defendants took the above-mentioned materially adverse actions, among others, against Ms. Thompson because of her protected activities.

189.     Any reasonable employee in Ms. Thompson' position would be dissuaded from reporting racism or unlawful conduct if they knew that they would be subjected to the kind of treatment that Ms. Thompson was forced to endure.

27

190.     Defendants' alleged bases for its adverse employment actions against Ms. Thompson are pretextual and have been asserted only to cover up the retaliatory nature of Defendants' conduct.

191.     As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of Section 1981, Ms. Thompson has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Thompson has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

192.     Ms. Thompson accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

193.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Thompson's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

194.     Defendants' conduct deprived Ms. Thompson of her statutory rights guaranteed under Section 1981.

195.     Ms. Thompson further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VII**
**29 U.S.C. § 207(1)**
**VIOLATION OF THE FLSA**
**(Plaintiff Johnson against all Defendants)**

196.     Mr. Johnson reincorporates the factual allegations in Paragraphs 14 through 95.

197.     Defendants were Mr. Johnson's employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

198.    Under 29 U.S.C. § 207, "no employer shall employ any of his employees… for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

199.    At all times material, Defendants did not adequately compensate Mr. Johnson for any hours worked above 40 each week.

200.    At all times material, Defendants failed to adequately compensate Mr. Johnson at the rate of one and one-half times his regular rate for any hours worked over 40, in violation of the FLSA.

201.    Under 29 U.S.C. § 211(c), "[e]very employer subject to any provision of this chapter… shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him…" 29 U.S.C. § 211(c).

202.    At all times material, Defendants failed to keep adequate records of Mr. Johnson's hours worked each day, total hours worked each workweek, and total overtime earnings for the workweek, in violation of the FLSA's collection of data provision.

203.    As a direct and proximate result of Defendants' failure to adequately compensate Mr. Johnson's overtime hours, and Defendants' failure to collect and maintain data, Defendants violated the FLSA.

204.    Pursuant to 29 U.S.C. § 216(b), Mr. Thompson is entitled to payment of overtime wages that Defendants were required to pay to Mr. Johnson and that Defendants improperly withheld, and an additional equal amount in the form of liquidated damages.

205.     Defendants willfully and intentionally refused to pay Plaintiff overtime wages earned during the relevant time.

206.     Defendants either knew from prior reports, or recklessly failed to investigate whether its failure to pay Mr. Johnson for any earned overtime wages violated the FLSA, and then it failed to timely correct its violation(s).

207.     The employment records for Mr. Johnson from which the Defendants' liability can be ascertained are within the exclusive custody and control of the Defendants.

208.     At this time, the total amounts are unknown and are to be determined upon further investigation.

209.     Mr. Johnson further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT VIII**
**29 U.S.C. § 207(1)**
**VIOLATION OF THE FLSA**
**(Plaintiff Thompson against all Defendants)**

210.     Ms. Thompson reincorporates the factual allegations in Paragraphs 14 through 95.

211.     Defendants were Ms. Thompson's employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

212.     Under 29 U.S.C. § 207, "no employer shall employ any of his employees… for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

213.     Plaintiff Thompson worked an average of 65 hours each week from May 2023 until July 2023, and an average of 55 hours each week from August 2023 until her termination in December 2023.

214. At all times material, Defendants did not adequately compensate Ms. Thompson for any hours worked above 40 each week.

215. At all times material, Defendants failed to adequately compensate Ms. Thompson at the rate of one and one-half times her regular rate for any hours worked over 40, in violation of the FLSA.

216. Under 29 U.S.C. § 211(c), "[e]very employer subject to any provision of this chapter… shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him…" 29 U.S.C. § 211(c).

217. At all times material, Defendants failed to keep adequate records of Ms. Thompson's hours worked each day, total hours worked each workweek, and total overtime earnings for the workweek, in violation of the FLSA's collection of data provision.

218. As a direct and proximate result of Defendants' failure to adequately compensate Ms. Thompson's overtime hours, and Defendants' failure to collect and maintain data, Defendants violated the FLSA.

219. Pursuant to 29 U.S.C. § 216(b), Ms. Thompson is entitled to payment of overtime wages that Defendants were required to pay to Ms. Thompson and that Defendants improperly withheld, and an additional equal amount in the form of liquidated damages.

220. Defendants willfully and intentionally refused to pay Plaintiff overtime wages earned during the relevant time.

221. Defendants either knew from prior reports, or recklessly failed to investigate whether its failure to pay Ms. Thompson for any earned overtime wages violated the FLSA, and then it failed to timely correct its violation(s).

222.    The employment records for Ms. Thompson from which the Defendants' liability can be ascertained are within the exclusive custody and control of the Defendants.

223.    At this time, the total amounts are unknown and are to be determined upon further investigation.

224.    Ms. Thompson further requests that his attorney's fees and costs be awarded as permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request this Court enter judgment against the Defendants for all damages suffered by the Plaintiffs, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, punitive damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendants' conduct in violation of Section 1981 and the FLSA.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues.

Dated:  Miami, Florida                            **DEREK SMITH LAW GROUP, PLLC**
        February 22, 2024,                        *Counsel for Plaintiffs*


                                                  */s/ Daniel J. Barroukh*
                                                  Daniel J. Barroukh, Esq.
                                                  Florida Bar No.: 1049271
                                                  Derek Smith Law Group, PLLC
                                                  520 Brickell Key Drive, Suite O-301
                                                  Miami, FL 33131
                                                  Tel: (305) 946-1884
                                                  Fax: (305) 503-6741
                                                  Danielb@dereksmithlaw.com

32